In the Matter of the Application of BENJAMIN FIRSHEIN, Appellant, for an Order under Article 78, Civil Practice Act, against GRACE A. REAVY, as President of the Civil Service Commission of the State of New York, and Others, Respondents.

Third Department, March 4, 1942.

*Saypol & Kotler* [*Irving H. Saypol* and *Leo Kotler* of counsel], for the appellant.

*John J. Bennett, Jr.,* Attorney-General [*Henry Epstein,* Solicitor General; *Patrick H. Clune,* Assistant Attorney-General, of counsel], for the respondents.

SCHENCK, J. This court may not conduct or supervise civil service examinations nor review them, the official acts of the Civil Service Commission not being judicial, but rather executive, ministerial and administrative. (*People ex rel. Caridi* v. *Creelman,* 150 App. Div. 746; *People ex rel. Schau* v. *McWilliams,* 185 N. Y. 92.)

The appellant here asks for an order pursuant to article 78 of the Civil Practice Act directing respondents to nullify and cancel the examination held on November 16, 1940, for the position of unemployment insurance referee, declaring null and void the said examination, restraining the respondents from announcing the

results of said examination, enjoining the respondents from promulgating and certifying any lists resulting from said examination or from utilizing the examination or lists resulting therefrom, and directing the respondents to hold a new examination.

It may not be found that the acts of the respondents were unreasonable, discriminatory, capricious, arbitrary or palpably illegal. Two thousand six hundred and forty-three applicants took the examination for unemployment insurance referee, of which 933 passed Part 1, and 882 passed both Part 1 and Part 2.

Petitioner-appellant complains, among other things, that the examination was voluminous and prolix and the time insufficient to give adequate consideration to the questions; that the printing arrangement on the question booklet tended to cause mental and physical strain; that there were inadequate eating facilities in the eignhborhood; and that a portion of the questions set forth in the examination paper was unrelated to the duties of the position for which the candidates were tested. Obiously, these are matters which must be left to the administrative discretion of the respondents. We may differ from the Commission as to the wisdom of presenting the questions found in the examination booklet; we may differ with the Commission as to the length of time afforded for the completion of the examination and even as to the eating facilities; however, this court may not substitute its judgment for that of the Commission and may interfere only when the Commission's actions have been erroneous, arbitrary, capricious, discriminatory or palpably illegal. (*People ex rel. Moriarty* v. *Creelman*, 206 N. Y. 570.)

It is the function of the Commission to fix a fair and reasonable standard by which may be tested the qualifications of applicants for appointment. " The exercise of that function may be the subject of judicial review only in the event of a clear showing that in fixing the test of fitness the action by the Commission was arbitrary, capricious or unreasonable." (*Matter of Cowen* v. *Reavy*, 283 N. Y. 232; *People ex rel. Sweeney* v. *Rice*, 279 id. 70.)

The Commission is charged with the examination and certification of persons seeking employment in the civil service and may use the methods which it deems best adapted for the determination of fitness, and while persons of reasonable intelligence may differ as to the scope and character of the examination, the judgment of the Commissioners in the preparation of the same must prevail in the absence of proof of bad faith or illegal action. (*Davis* v. *Wiener*, 260 App. Div. 127; *People ex rel. Moriarty* v. *Creelman, supra.*)

Here the Commission charged with the preparation and conduct of the examination adopted what it believed to be the best

method for the determination of fitness of a great number of applicants. The members of the court may not agree as to the method adopted, the time allowed or the character of the questions presented, nevertheless, this difference of opinion does not warrant the cancellation of a state-wide competitive examination in which upwards of 2,500 persons participated. The determination as to the character and scope of the examination was for the Commission.

The order appealed from should be affirmed.

BLISS, HEFFERNAN and FOSTER, JJ., concur; HILL, P. J., dissents, in an opinion.

HILL, P. J. (dissenting). Petitioner appeals from an order of the Albany Special Term which dismissed his petition on the merits. It appears from the petition and from the record that he was one of some 2,700 persons who took an examination held by the Civil Service Commission on November 16, 1940, for the purpose of obtaining an eligible list from which referees under the New York State Unemployment Insurance Law* could be appointed. He brought this proceeding under article 78 of the Civil Practice Act asking that the examination be declared null and void or in the alternative, if there are issues of fact as to its illegality, that they be tried.

He charges that Part 1 of the examination was prolix and so voluminous that it was physically impossible to consider and answer all questions in the allotted time of four hours. This portion is divided into sections A, B and C. The first two contain 260 questions, and there is a note on the first page: " It is suggested that you devote not more than 3 hours in answering Sections A and B." A computation shows that this would allow an average of just under forty-two seconds a question. These sections consist of " true-false " and " multiple-choice " items, the answers to be recorded upon an answer sheet furnished by the examiner. The candidate was directed in connection with the answers to " find the pair of dotted lines under the letter which stands for the right answer and blacken the space between those lines with the special pencil. * * * Mark each of your answers with a heavy black pencil mark, going over each mark two or three times, and pressing firmly on the pencil. Make each mark as long as the dotted lines." The parallel lines are just under a quarter of an inch in length and the width of a blunt pencil mark. Many of the questions in section A are simple and have direct reference to the New York State Unemployment Insurance Law, and somewhat to the substantive and procedural law. Others are more complicated. Quoting from the " true-false " items:

* Labor Law, art. 18.— [REP.

"12. The personal service of a summons in an envelope is an invalid service where the defendant immediately opened the envelope in the presence of the process server and found the summons."

"40. Under the New York State Unemployment Insurance Law, a corporation organized after the dissolution of a former corporation which was dissolved under Sec. 105 of the Stock Corporation Law, which uses the same trade name as the former corporation, is deemed a ' successor in interest.' "

And from the " multiple-choice " items:

"64. ' Opportunity for fair hearing, before an impartial tribunal, for all individuals whose claims for unemployment compensation are denied.' The above quotation is an excerpt taken from the: (A) New York State Unemployment Insurance Law — ' Section 533, Rules Governing Hearings and Appeals.' (B) New York State Unemployment Insurance Law — ' Section 500, Declaration of Policy of the State.' (C) Federal Social Security Act — ' Section 303, Provisions of State Laws.' (D) Federal Social Security Act — ' Section 903, Certification of State Laws.' "

"67. The Federal Wagner-Peyser Act authorizes: (A) Grants-in-aid to states for aid to dependent children. (B) Grants to states for maternal and child welfare in rural areas. (C) Grants to states for the establishment of state employment offices. (D) Establishment of rules and regulations by the Surgeon General of the United States Public Health Service for public health agencies."

A group of questions required the candidate to give his opinion whether or not an employer was subject to the payroll tax, or whether the facts stated in the question were insufficient to permit the expression of an opinion. The following is an example:

"91. The XYZ Corporation, operating since January 1, 1935, employs five persons, all of whom are residents of New York State. Three of these persons work in New York State and two work out of New Jersey, with their base of operations in New Jersey. The latter two persons work eight months in New Jersey, three and one-half months in the New England States and fifteen days of each year in New York."

Others are devoted to the subject of the eligibility of an unemployed person to receive benefits under the act. The candidate was to state from a hypothetical question whether the applicant would be immediately eligible, or become so after a waiting period of three weeks, or of ten weeks, or ineligible for benefits at any time. An example:

"106. Claimant was regularly employed in covered employment since January 1, 1938, and lost his job as the result of a strike

on April 5, 1940. He registered for benefits on April 6, 1940 and a ten-week waiting period was imposed. Four weeks later the strike was over but claimant was not requested to return to work. Five weeks following the conclusion of the strike he obtained employment with another employer from which he was laid off on September 1, 1940. (Your answer should be related to loss of employment in September 1, 1940.) "

Petitioner asserts that the type used in the examination book was of too small a size, and the spacing between the lines less than required; that this tended to increase the heavy burden caused by the lack of reasonable time for each question. This is denied by a physician who gave his evidence in an affidavit attached to the answer. I believe that the technical language of the expert describing the type and page is less understandable than a comparison between the examination book and the well-known pages of the New York Reports of the Court of Appeals, to which a candidate would have had frequent recourse in his preparation. The pages in the latter are nine inches long with about an inch margin at top and bottom, five and a half inches wide with just over five-eighths of an inch margin on each side. On the pages where the print is solid, there are from thirty-eight to forty lines in the seven inches available. The pages of the examination book are thirteen and three-fourths inches long, a half inch margin at top and bottom, eight and a half inches wide, with a three-fourths inch margin on each side. The number of lines on a whole page averages about ninety. For the purpose of more exact comparison with the Court of Appeals Reports, portions of the examination pages seven inches long contain from fifty to fifty-six lines. The number of words on a full line of the examination book varies from sixteen to twenty-two, in the Court of Appeals volume from eight to eleven, most frequently ten.

There are opposing statements as to the arrangements and surroundings of the places where the examinations were held, thus no way to verify the complaints made by petitioner or the explanations on behalf of the Commission.

Further complaint is that questions from 130 to 260, inclusive, were unrelated and inappropriate to test merit and fitness for this position. Among the true-false items in the portion referred to are found:

"136. Technological changes are more likely to cause unemployment in those industries which sell products for which the demand is inelastic than in those industries with elastic demand.

" 137. Wage rates invariably move upward under a free competitive economic system.

" 138. The timing of the installation of technological improvements so that they occur during depression periods is a method of reducing the unemployment resulting from the technological improvements."

Among the multiple-choice:

" 198. The theory of free private enterprise assumes, among other things, that: (A) Each individual will act in the same manner in making his purchases. (B) All individuals comprehend the subtleties of modern advertising. (C) Some individuals will have as their motivating drive the total benefits to the group as a whole. (D) Each individual will follow his own best interest in making his choices.

" 199. The economic theory of free, unrestricted competition in business is most commonly attributed to: (A) Adam Smith. (B) Jean Jacques Rousseau. (C) Sir Francis Bacon. (D) Andrew W. Mellon."

" 217. An aim of scientific management is to increase profits by: (A) The setting of prices by scientifically selected regulatory boards. (B) Getting improved quality production at lower cost. (C) Requiring more rigid general standards of restricted production. (D) The indirect elimination of competition by price agreements between competing companies.

" 218. In industry, probably the *chief* advantage of a policy of filling vacancies by promotion is that this procedure: (A) Provides an easy check on the work of the individual. (B) Eliminates personnel problems in a department. (C) Stimulates the worker to improve his work, general knowledge, and technique. (D) Raises the average salary of the workers."

Doubtless an examination should have relation to the duties to be performed. A cursory review of the statute will sufficiently describe the duties of the position. A payroll tax is levied on all employers of certain classes. The referee may conduct hearings to determine the amount (Labor Law, § 523) and a fund is created, augmented somewhat by distribution from the Federal government. One out of employment for a period may apply for payments from the fund, " the validity of the claim and the amount of benefits payable to the employee thereunder shall be determined in accordance with the rules and procedure established by the Commissioner, and when such determination is issued by the Commissioner it shall be deemed the initial determination of the claim." (Labor Law, § 510, subd. 3.) An employee who is dissatisfied with the initial determination may personally or by mail request a hearing. " Thereupon a hearing shall be held by a referee who shall render his decision within five days after the hearing is concluded."

(Labor Law, § 530.) Within twenty days thereafter, " the Commissioner, the employee and any party affected thereby who appeared at the hearing may appeal to the appeal board." (Labor Law, § 531.) The appeal board may determine the matter on the evidence taken before the referee or may take additional evidence. (Labor Law, § 532.) " A decision of a referee under any provision of this article, if not appealed from, shall be final on all questions of fact and law. A decision of the appeal board shall be final on all questions of fact, and, unless appealed from, shall be final on all questions of law." (Labor Law, § 534.) Within thirty days after the decision by the appeal board, the Commissioner or any other party affected thereby who appeared before the appeal board may " appeal questions of law involved in such decision " to the Appellate Division, Third Department, and an appeal may be taken from the decision of that court to the Court of Appeals. (Labor Law, § 535.)

This court may review the acts of the Civil Service Commission in connection with the examination. If it appears as matter of law that the Commission did not act in an unreasonable, arbitrary or discriminatory manner, we should affirm the order of the lower court which dismissed the petition; if as matter of law we find that the conduct of the Commission was unreasonable, arbitrary or discriminatory, we may reverse the order of the Special Term and grant the prayer of the petition, or, if we determine that there is a triable issue of fact raised, we may reverse the order and remit the matter to the Special Term, for a trial. (Civ. Prac. Act, § 1295.)

The Constitution of the State provides that appointments and promotions " shall be made according to merit and fitness to be ascertained, so far as practicable, by examinations, which, so far as practicable, shall be competitive * * *." (Art. 5, § 6.) The statutes concerning examinations reflect the constitutional provision. The Commission may not only test the knowledge of the applicant in the line of his proposed employment, but give general tests of intelligence, mental alertness and as to special ability and aptitude. (*Matter of Fink* v. *Finegan,* 270 N. Y. 356.)

About one hundred of the questions propounded are intended to ascertain if a candidate approves so-called progressive social theories and is averse to the less modern doctrines as to social and economic changes and whether he will apply approved social experiments in the discharge of his duties. It is difficult to see the purpose of these questions in view of the limited jurisdiction of a referee. He may in the first instance determine the amount of the payroll tax to be paid by an employer and the benefits to be

received by an unemployed person. His views as to "a free competitive economic system" as distinguished from a managed social economy, will be of little aid to him in being a better referee, as he will have little opportunity in his limited judicial field either to frustrate or further general social theories not included in the statute under which he works. It might be suspected that these questions were asked to ascertain the school of political thought which the candidate favored. This would not accord with the purpose which civil service is supposed to accomplish — the selection of the best qualified candidates without regard to political affiliation.

It is pleaded and not denied that the chief of the Division of Examinations has written a letter in answer to complaints about this examination: "A very careful analysis is being made of all of the items in the examination. Based on this analysis and authoritative opinions from several sources, a rating scale will be prepared. This rating scale will make allowance for any items that may be determined to be ambiguous or unrelated and will also take into consideration the time element." After the examination it seems questionable if the Commission should be permitted to obtain "authoritative opinions from several sources" in order to fix and prepare "a rating scale," and after a candidate has labored with more than a hundred questions unrelated to the duties to be performed, then to "make allowance for any items that may be determined to be ambiguous or unrelated," and then give fair and equitable consideration to the "time element." The rules under which the examination was held state, "Candidates must attain an average of 75% on Part 1 in order to be rated on Part 2."

Sufficient issues are raised by the pleadings to require a trial. The order should be reversed on the law, and the matter remitted to the Special Term for a trial of the issues, with fifty dollars costs.

Order affirmed, without costs.